# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 9, 2026

Lyle W. Cayce
Clerk

No. 24-10708

---

GENISE KINCANNON, *on their own behalf and on behalf of all others similarly situated*; DAVID SAMBRANO, *on their own behalf and on behalf of all others similarly situated*,

*Plaintiffs—Appellees/Cross-Appellants*,

DAVID CASTILLO, *on their own behalf and on behalf of all others similarly situated*; KIMBERLY HAMILTON, *on their own behalf and on behalf of all others similarly situated*; DEBRA JENNEFER THAL JONAS, *on their own behalf and on behalf of all others similarly situated*; JARRAD RAINS, *on his own behalf and on behalf of all others similarly situated*; ALYSE MEDLIN, *on her own behalf and on behalf of all others similarly situated*; CHARLES BURK, *on his own behalf and on behalf of all others similarly situated*; SETH TURNBOUGH, *on their own behalf and on behalf of all others similarly situated*,

*Plaintiffs—Appellees*,

*versus*

UNITED AIRLINES, INCORPORATED,

*Defendant—Appellant/Cross-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:21-CV-1074

---

Before HIGGINSON, WILLETT, and ENGELHARDT, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:[*]

Several United Airlines employees allege that United failed to offer reasonable religious and medical accommodations to its COVID-19 vaccine mandate, thereby unlawfully discriminating against them and all others similarly situated. Plaintiffs moved to certify three classes of employees aggrieved by United's polices. The district court rejected two of those classes but certified a modified subclass of religious-accommodation seekers whom United accommodated with unpaid leave. The parties cross appeal the district court's class certification order. Because we hold that the district court did not abuse its discretion, we AFFIRM.

## I.

In August 2021, United instituted a COVID-19 vaccine mandate for every employee in the United States. To comply with the mandate, employees were required to get vaccinated within five weeks of the FDA's approval of a vaccine, or—if a vaccine was not yet approved—by October 25, 2021. Employees could avoid getting vaccinated if they requested and received a religious or medical accommodation.

To request a religious accommodation, United required its employees to articulate a religious belief that prevented them from receiving the vaccine and submit a letter from a third party, such as a friend or family member, substantiating that belief. And to request a medical accommodation, employees had to submit medical documentation demonstrating a need for an exemption to the vaccine requirement. In all, 5,885 employees requested an accommodation, and 4,070 accommodations were granted.

---

[*] JUDGE WILLETT concurs in all but Parts IV.B.3 and V of the majority opinion.

No. 24-10708

Initially, United planned to place all employees who were granted an exemption on unpaid leave beginning on October 2, 2021, and ending whenever the "pandemic meaningfully recede[d]." At the time, this was the only accommodation United planned to offer. However, before this policy went into effect, Plaintiffs—United employees who requested religious or medical accommodations—initiated this suit and moved for a preliminary injunction. They alleged that United's plan violated Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act by forcing them to choose between taking the vaccine in violation of their faiths or at the expense of their health and their livelihoods—i.e., by denying them a reasonable accommodation. The district court issued a temporary restraining order preventing United from placing vaccine-exempt employees on unpaid leave, but it later declined to enter a preliminary injunction after concluding that Plaintiffs failed to show that they would suffer irreparable harm absent an injunction. *Sambrano v. United Airlines, Inc.*, 570 F. Supp. 3d 409, 411 (N.D. Tex. 2021). On appeal, another Panel of this court reversed, concluding that Plaintiffs would be irreparably harmed by the "ongoing coercion of being forced to choose either to contravene their religious convictions or to lose pay indefinitely." *Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *9–10 (5th Cir. Feb. 17, 2022) (per curiam).

While this dispute was unfolding, United implemented a revised accommodation policy for non-customer-facing employees, such as mechanics and ramp agents. Under the new policy, those employees were allowed to continue working but were required to comply with United's masking-and-testing regime—which Plaintiffs characterize as intentionally and unlawfully punitive. However, customer-facing employees, such as pilots and flight attendants, were still placed on indefinite unpaid leave starting in November 2021, though they were given the opportunity to apply for an alternative non-customer-facing position within United. In total, 2,221

No. 24-10708

employees were accommodated with unpaid leave and 1,078 were subjected to United's masking-and-testing accommodation.

Once back in the district court, Plaintiffs moved to certify the following three classes:

> 1. <u>Rule 23(b)(2) Class</u>: All individuals who submitted a request for a reasonable accommodation from United's COVID-19 vaccine mandate due to a sincerely held religious belief or medical disability and then faced the choice of: abandoning their religious beliefs or medical needs (i.e., get vaccinated); accepting indefinite leave; or being fired or otherwise separated.

> 2. <u>Rule 23(b)(3) Masking-and-Testing Subclass</u>: All employees United deemed non-customer-facing who received an accommodation due to a sincerely held religious belief or medical disability and were subject to the purposely punitive masking-and-testing accommodation.

> 3. <u>Rule 23(b)(3) Unpaid-Leave Subclass</u>: All employees United deemed customer facing who received an accommodation due to a sincerely held religious belief or medical disability and who were put on unpaid leave.

The district court granted in part and denied in part Plaintiffs' motion. It concluded that the Rule 23(b)(2) class and the Rule 23(b)(3) masking-and-testing subclass failed to meet the requirements of Federal Rule of Civil Procedure 23, and it thus rejected those classes. However, the court found that the Rule 23(b)(3) unpaid-leave subclass was certifiable as to the religious-accommodation seekers, though it excluded United employees who received a medical exemption for lack of commonality.

No. 24-10708

Both parties sought leave to appeal the district court's class-certification order, which we granted pursuant to Rule 23(f).[1] Plaintiffs argue that each of their proposed classes comports with Rule 23, and they contend that the district court abused its discretion in rejecting the Rule 23(b)(2) class and the Rule 23(b)(3) masking-and-testing subclass and in excluding the medical-accommodation seekers from the unpaid-leave subclass.[2] United argues that those denials were correct, but it challenges the court's certification of the modified Rule 23(b)(3) unpaid-leave subclass.

## II.

As a preliminary matter, we must determine whether Plaintiffs Genise Kincannon and David Sambrano are proper parties to appeal the district court's rejection of the Rule 23(b)(2) class and the Rule 23(b)(3) masking-and-testing and ADA subclasses. United contends that Kincannon and Sambrano—the only Plaintiffs named in the Rule 23(f) petition—are members only of the certified subclass and, therefore, are not aggrieved by the rejection of the other classes.

"Ordinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom. A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333 (1980). Conversely, "[a] party is 'aggrieved' and

---

[1] Rule 23(f) allows courts of appeals to hear "an appeal from an order granting or denying class-action certification."

[2] Plaintiffs proposed one unpaid-leave subclass comprising both religious- and medical-accommodation seekers. However, the district court's order subdivided this class when it excluded the medical-accommodation seekers. For purposes of this appeal, the court will separately analyze whether certification is proper for the Title VII claimants and the ADA claimants, the latter of whom we will refer to as the "ADA subclass."

No. 24-10708

ordinarily can appeal a decision granting in part and denying in part the remedy requested." *Forney v. Apfel*, 524 U.S. 266, 271 (1998).

We conclude that Kincannon and Sambrano are aggrieved by the district court's adverse determinations, and therefore their cross-appeal is proper. As for the Rule 23(b)(2) class, Kincannon and Sambrano fall squarely within Plaintiffs' proposed definition. They sought religious accommodations to United's vaccine mandate and were subject to United's initial universal unpaid-leave policy. So, they are proper parties to appeal the district court's rejection of that class.

Next, although Kincannon—a flight attendant—is a customer-facing employee, Plaintiffs argue that she belongs in the masking-and-testing subclass (as well as the unpaid-leave subclass) because she was subjected to United's masking-and-testing accommodation when United was temporarily enjoined from implementing its unpaid-leave policy. While it is unclear that Kincannon meets the class definition for this subclass, her claim of class membership and the district court's rejection of this subclass make her a proper party to appeal the court's decision.

Finally, Kincannon and Sambrano have "individual interest[s]" in the inclusion of medical-accommodation seekers in the unpaid-leave subclass to which they belong, making them aggrieved parties with standing to appeal. *See Roper*, 445 U.S. at 340 (emphasis omitted). Most obviously, the exclusion of ADA claimants from this subclass reduces the availability of attorney's fees and shrinks the punitive damages pot. *See id.* at 336, 340 (holding that plaintiffs could appeal an adverse certification ruling—notwithstanding the district court's entry of judgment in their favor—because they had an "individual interest in the resolution of the class certification question in their desire to shift part of the costs of litigation to those who will share in its benefits if the class is certified and ultimately prevails"). Accordingly, Kincannon and

No. 24-10708

Sambrano may appeal the district court's refusal to certify the proposed sub-class as a whole.

Thus, we conclude that Kincannon and/or Sambrano were aggrieved by each denial of certification, and therefore they are proper parties to appeal. We turn now to the parties' substantive arguments regarding class certification.

### III.

We review class certification orders for abuse of discretion, recognizing the "essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." *Sampson v. United Servs. Auto. Ass'n*, 83 F.4th 414, 418 (5th Cir. 2023) (quoting *Ahmad v. Old Republic Nat'l Title Ins. Co.*, 690 F.3d 698, 701–02 (5th Cir. 2012)). "An abuse of discretion occurs only when all reasonable persons would reject the view of the district court." *Id.* at 418–19 (quoting *Cleven v. Mid-Am. Apartment Cmtys., Inc.*, 20 F.4th 171, 176 (5th Cir. 2021)). However, we review de novo whether the district court applied the correct legal standard. *Id.* at 419.

### IV.

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). A party seeking to certify a class "must affirmatively demonstrate" that the requirements of Federal Rule of Civil Procedure 23 are met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Specifically, he must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly

and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Rule 23 also implicitly requires that the class members be ascertainable. *John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

In addition to these prerequisites, the party must also demonstrate that the putative class complies with one of Rule 23(b)'s requirements. *Sampson*, 83 F.4th at 418 ("Certification requires plaintiffs to satisfy all requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the three requirements listed in Rule 23(b)."). Here, Plaintiffs sought certification under Rule 23(b)(2) and Rule 23(b)(3). We start with the Rule 23(b)(2) class and then consider the three Rule 23(b)(3) subclasses.

## A.

A class is certifiable under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (citation omitted). This requires that "a single injunction or declaratory judgment" be capable of providing relief to each class member. *Id.*

In our circuit, "monetary relief may be obtained in a (b)(2) class action so long as the predominant relief sought is injunctive or declaratory." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 (5th Cir. 1998). Put differently, for monetary relief to be available, it must be "incidental to requested injunctive or declaratory relief," meaning that it "flow[s] directly from liability to the class *as a whole* on the claims forming the basis of the injunctive

No. 24-10708

or declaratory relief." *Id.* at 415. When damages "require separate adjudication, they predominate under *Allison*," and thus a Rule 23(b)(2) class is improper. *Washington v. CSC Credit Servs. Inc.*, 199 F.3d 263, 269 (5th Cir. 2000). Further, while this court has "[a]ssum[ed] [that] punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts," any such damages must be incidental and should "typically be concomitant with, not merely consequential to, class-wide injunctive or declaratory relief." *Allison*, 151 F.3d at 415, 417.

Here, Plaintiffs allege that United violated Title VII and the ADA by attempting to offer an unreasonable accommodation—unpaid leave—to this class's members. They seek an injunction preventing United from terminating or placing on unpaid leave any employee who requires a religious or medical accommodation to the vaccine, as well as punitive damages.

The district court rejected this class, concluding that Plaintiffs failed to show that the putative class members were injured by United's policy in the same way. Although each member was allegedly threatened with the same policy, the district court explained that the members responded differently—and so were harmed differently. For example, some employees vaccinated, while others accepted unpaid leave or decided to work elsewhere. Because the allegedly unlawful policy impacted the class members differently, the court determined that commonality and typicality were lacking. For the same reason, it also held that Plaintiffs' request for punitive damages would require individualized inquiries, rendering punitive damages predominant.

Plaintiffs argue that the district court missed the mark by looking at the downstream harm stemming from United's policy, rather than the harm inflicted by the policy's coercive effect alone. Citing our previous statement that United's "coercion [was] harmful in and of itself," *see Sambrano*, 2022

No. 24-10708

WL 486610, at *3, *9, Plaintiffs contend that each member was injured in the same way because each was unlawfully coerced. Accordingly, it avers that commonality is satisfied and that punitive damages can be awarded class-wide without individualized proof of injury.

Plaintiffs' arguments fail to persuade us that the district court abused its discretion. For starters, this court's prior holding that United's coercion threatened irreparable harm establishes—at most—"that there has been general harm to the group and that injunctive relief [may be] appropriate." *Allison*, 151 F.3d at 417. But "[p]unitive damages cannot be assessed merely upon a finding that the defendant engaged in a pattern or practice of discrimination." *Id.* Our previous holding does not establish that punitive damages are necessarily available to Plaintiffs, nor that they could be awarded to the class as a whole merely because each putative member suffered a generalized harm.

Further, as the district court found, United's policy impacted the putative class members differently, with some members suffering more severely than others. At trial, a jury would be required to decide, for example, whether a class member who succumbed to United's threat and took the vaccine in contravention of his faith or at the detriment of his health is entitled to more or less punitive damages than a member who accepted unpaid leave or a member who quickly found another job. The district court reasonably concluded that punitive damages are not incidental because they do not "flow directly from liability to the class *as a whole*," but instead require individualized inquiries. *See id.* at 415 ("Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations."). This class therefore falls outside *Allison*'s confines for punitive-damages awards, as the putative class members here were not "affected by [United's] policies and practices

No. 24-10708

in the same way." *Id.* at 417. Accordingly, because Plaintiffs' request for punitive damages predominates, the district court did not abuse its discretion in rejecting this class.[3] *See id.* at 416 ("The district courts, in the exercise of their discretion, are in the best position to assess whether a monetary remedy is sufficiently incidental to a claim for injunctive or declaratory relief to be appropriate in a (b)(2) class action.").

### B.

Next, we consider Plaintiffs' Rule 23(b)(3) subclasses. A (b)(3) class is certifiable if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

Commonality, a prerequisite to certification, is a central dispute for each subclass at issue here. To establish commonality, the party seeking class certification must show that each class member "suffered the same injury." *Wal-Mart*, 564 U.S. at 349–50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. Rather, the claims must depend on a "common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Predominance is also contested. To establish predominance, the party moving for certification must show that the "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v.*

---

[3] Because we agree with the district court that this class does not comport with Rule 23(b)(2), we need not consider whether Rule 23(a)'s prerequisites are met.

No. 24-10708

*Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). This requires him to demonstrate that common questions are "more prevalent or important" than individualized questions. *Id.* (citation omitted); *see Chavez v. Plan Benefit Servs., Inc.*, 108 F.4th 297, 316 (5th Cir. 2024) ("In order to 'predominate,' common issues must constitute a significant part of the individual cases." (quoting *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999)). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453 (citation modified).

The predominance requirement is "far more demanding" than the commonality requirement. *Amchem*, 521 U.S. at 623–24. But "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate," the class may be certified "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 577 U.S. at 453 (citation modified).

Plaintiffs appeal the district court's rejection of their Rule 23(b)(3) masking-and-testing and ADA subclasses, and United appeals the certification of the modified unpaid-leave subclass. We consider each in turn.

1.

The masking-and-testing subclass comprises United employees who were allowed to continue working after receiving a religious or medical accommodation but were required to comply with purportedly "punitive" and "intentionally harsh" masking-and-testing requirements. The district court rejected this subclass for lack of commonality and typicality. In light of

No. 24-10708

its previous ruling that "the requirement to eat in designated areas, wear an FDA-approved mask at work, and submit COVID-19 test results" alone does not constitute a sufficient adverse employment action for Title VII, *Sambrano v. United Airlines, Inc.*, 707 F. Supp. 3d 652, 664 (N.D. Tex. Dec. 18, 2023), the court held that the class could not rely on the masking-and-testing requirement as their common injury. Instead, it found that the actionable harm among the class members varied. For example, some putative members allege that masking made it difficult to communicate, while others allege that they were harassed or struggled to breathe. Because the court found that the employees did not suffer the same injury, it concluded that the claims were not amenable to class-wide resolution.

Plaintiffs challenge this conclusion, arguing that the masking-and-testing accommodation itself imposed "some harm" on each class member, such that the legality of United's policy can be decided on a class-wide basis. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) ("To make out a Title VII discrimination claim, a [plaintiff] must show some harm respecting an identifiable term or condition of employment.").

We again conclude that the district court did not abuse its discretion. At the outset, the district court's order holding that United's masking-and-testing accommodation is not an adverse employment action is not on appeal, and Plaintiffs' attack of that holding—the crux of their challenge to the rejection of this subclass—is not proper at this juncture.[4] But even if the district court were incorrect on that point, it still did not abuse its discretion because it reasonably concluded that masking-and-testing inflicted diverse injuries. And although these harms—such as eating alone or being sprayed

---

[4] Plaintiffs previously appealed the district court's order holding that the masking-and-testing requirement is not an adverse employment action. However, they voluntarily dismissed that appeal.

with Lysol—purportedly stem from forced mask-wearing, each putative member would have to present evidence demonstrating the extent of his or her injury; Plaintiffs cannot rely merely on their characterization of the accommodation as "punitive" to establish a uniform harm, given that putative members had different experiences. In other words, regardless of whether the accommodation was in fact punitive, the putative class members were punished in different ways.

Since the harms suffered—that is, the alleged adverse employment actions—among the putative members vary significantly, Plaintiffs will have to "present evidence that varies from member to member" to establish United's liability. *Tyson Foods*, 577 U.S. at 453 (citation modified). Notwithstanding the presence of other common questions, the individualized nature of this crucial question is sufficient to find predominance lacking. *See Davis v. Ft. Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014) ("To establish a prima facie case of religious discrimination under Title VII, the plaintiff must present evidence that . . . she suffered an adverse employment action . . . ." (citation modified)); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) ("To establish a prima facie discrimination claim under the ADA, a plaintiff must prove . . . that he was subject to an adverse employment decision . . . ." (citation modified)).

### 2.

The district court also found commonality lacking among the ADA claimants who were accommodated with unpaid leave. It concluded that the underlying ADA claim requires individualized assessments to determine whether each class member had a qualifying disability. *See generally* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."). Plaintiffs counter that individualized assessment is not necessary here because United accepted the putative members' accommodation requests, and the record contains supporting medical documentation. Neither point persuades us that the district court abused its discretion.

First, United's grant of a medical accommodation does not establish as a matter of law that any employee had a qualifying disability. Even if United's view regarding whether an individual met the standard were relevant, the record reflects that United did not in fact limit medical accommodations to those who were protected under the ADA. Instead, United accepted accommodation requests from "employees who [could not] get vaccinated due to medical reasons, including a disability (as defined by applicable law), pregnancy (or childbirth or a related medical condition), being a nursing mother, or having a documented medical condition that contraindicates the vaccination." And even supposing the subclass is limited to those who specifically asserted that they had a disability, United's Human Resources manager explained that "[b]oth prior to and during the pandemic, United did not require employees who submitted accommodation requests to satisfy the legal requirements of . . . the Americans with Disabilities Act. In my experience United freely granted many accommodation requests regardless of whether or not those requests would have satisfied certain technical legal requirements." Plaintiffs do not refute this evidence.

Second, and even more fundamentally, the determination of whether someone has a qualifying disability under the ADA does not generally lend itself to class-wide resolution, at least where the putative class members suffer from a variety of disabilities. Under the ADA, "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or

No. 24-10708

(C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Whether someone is limited in a major life activity due to an impairment or is regarded as such, or even whether he has a record of a disability, are individualized questions. *See Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 479 (5th Cir. 2023) ("Determining whether a plaintiff has a disability . . . requires an individualized assessment of the impact of the impairment on an individual's major life activities."); *Chandler v. City of Dall.*, 2 F.3d 1385, 1396 (5th Cir. 1993) ("[T]he determinations of whether an individual is handicapped or 'otherwise qualified' [under the similarly-worded Rehabilitation Act] are necessarily individualized inquiries."); *Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999) (holding that the district court did not abuse its discretion in rejecting a class of disabled police officers because it "would have had to conduct individualized inquiries to determine whether a potential class member met the statutory definition"). The court did not err in declining to certify this subclass, given the inability to resolve these significant questions class-wide.

None of the out-of-circuit district court cases Plaintiffs cite to show that ADA claims have been heard on a class-wide basis persuade us. While some courts have found commonality among class members with diverse disabilities, *see, e.g.*, *Newkirk v. Pierre*, No. 19-CV-4283, 2020 WL 5035930, at *8–9 (E.D.N.Y. Aug. 26, 2020), the district court in this case did not abuse its discretion in reaching the opposite conclusion. Our circuit precedent and the ADA's text evince a preference—if not a mandate—for an individualized inquiry into each plaintiff's claimed disability. The importance of this issue and the need for individualized proof at least undermine the predominance requirement. We therefore affirm the exclusion of the ADA claimants from the unpaid-leave subclass.

No. 24-10708

3.

Finally, United appeals the district court's certification of a subclass of customer-facing employees who received religious exemptions to United's vaccine mandate and who were accommodated with unpaid leave. It argues that commonality is lacking, individualized questions predominate, and a class action is not the superior method of adjudicating this Title VII religious-discrimination claim.[5] We address each of these arguments in turn.

a.

Title VII makes it unlawful for an employer to discriminate against its employees on the basis of the employees' religion. 42 U.S.C. § 2000e-2(a)(1). To that end, Title VII imposes on the employer an "obligation to make reasonable accommodations for the religious observances of its employees" unless doing so would cause it to "incur undue hardship." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000). Courts analyze failure-to-accommodate claims under a burden-shifting framework that requires the employee to first make a prima facie case of religious discrimination. *Davis*, 765 F.3d at 485. To do so, the employee must show that "(1) she held a bona fide religious belief, (2) her belief conflicted with a requirement of her employment, (3) her employer was informed of her belief, and (4) she suffered an adverse employment action for failing to comply with the conflicting employment requirement." *Id.* (quoting *Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013), *abrogated on other grounds by*, *Groff v. DeJoy*, 600 U.S. 447 (2023)); *see generally id.* ("[A] belief is 'religious' if it is 'a sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by God.'" (quoting *United States v. Seeger*, 380

---

[5] United does not dispute that the numerosity, typicality, ascertainability, and adequacy requirements are satisfied.

No. 24-10708

U.S. 163, 176 (1965)). If the employee makes a prima facie case, the employer then must demonstrate either that it reasonably accommodated her or that it was unable to do so without incurring undue hardship. *Id.*

United contends that three questions—the sincerity of the class members' beliefs, the reasonableness of the unpaid-leave accommodation, and whether a different accommodation would have imposed an undue hardship on United—are not amenable to class-wide adjudication but rather require individualized inquiries that undermine commonality. The district court engaged in a robust analysis of each of these contentions and ultimately concluded that the commonality requirement was satisfied. We hold that the district court did not abuse its discretion.

i.

Anytime a court considers the sincerity of an individual's religious beliefs, it must act with "a light touch, or judicial shyness." *Id.* at 486 (quoting *Tagore*, 735 F.3d at 328). "Examining religious convictions any more deeply would stray into the realm of religious inquiry, an area into which we are forbidden to tread." *Id.* (citation modified). But while sincerity is "easily established"—in the rare instance it is even challenged, *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 791 (5th Cir. 2012)—that "does not mean it is a non-existent requirement or non-essential for Rule 23 purposes," *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 935 (5th Cir. 2023).

"The sincerity of a person's religious belief is a question of fact unique to each case." *Davis*, 765 F.3d at 485. "[A] plaintiff's sincerity in espousing a religious practice 'is largely a matter of individual credibility,'" and it is sometimes "accepted on little more than the plaintiff's credible assertions." *Wright v. Honeywell Int'l, Inc.*, 148 F.4th 779, 783–84 (5th Cir. 2025) (citations omitted). Courts also often look to the plaintiff's "words and

No. 24-10708

actions" for evidence of a sincere religious belief. *Moussazadeh*, 703 F.3d at 791.

The district court concluded that the words and actions common to each class member here substantiated the sincerity of their religious convictions against getting the COVID-19 vaccine. As the district court explained, to receive a religious accommodation, an employee had to request a religious exemption, which required him to articulate a religious reason for not getting the vaccine. The employee also had to submit a letter from a third-party who could attest to his religious beliefs. If United was satisfied with the employee's showing of sincerity, it placed him on indefinite unpaid leave—stripping the employee of his income but enabling him to live out his claimed religious beliefs. For the past four years, Plaintiffs have sought to hold United accountable for its purported violation of their beliefs through this lawsuit. The district court found that this uniform conduct evinces the sincerity of the class members' religious beliefs and satisfies the commonality requirement.

United challenges this conclusion, arguing that claims raising questions of religious sincerity can never be decided in a class action. It avers that our decision in *Braidwood*, along with other circuit precedent, requires an individualized inquiry into the sincerity of each class member's beliefs and that conflicting evidence in the record demonstrates that not all class members' beliefs were sincere. Neither of these arguments convince us that the district court abused its discretion, though we note that class certification does not prevent United from challenging the sincerity of the class-representative Plaintiffs at trial, nor the sincerity of general class members during class rostering, as discussed below.

To start, United's reliance on *Braidwood* is misguided. In that case, the plaintiffs sought to certify classes of employers who claimed that their

No. 24-10708

religious beliefs exempted them from Title VII's requirement that they not discriminate on the basis of sexual orientation or transgender status. *Braidwood*, 70 F.4th at 921; *see generally* 42 U.S.C. § 2000e-1(a) (Title VII "shall not apply to . . . a religious corporation . . . ."). This court reversed certification, partly because it would have to "make subjective distinctions to determine whether 'religion play[ed] an important role' in an organization" such that it was exempt from Title VII. *Braidwood*, 70 F.4th at 935. That determination, the court explained, "can be made only on a case-by-case basis and not at this level of abstraction at the class-certification stage." *Id.* But that holding—on which United heavily relies—concerned whether the businesses were subject to Title VII's requirements, not whether the businesses held sincere religious beliefs. *Id.* at 935 n.45, 936 n.48 (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir. 2007), for its nine-factor religious-exemption test for entities). On its face, *Braidwood*'s rejection of class-wide resolution of Title VII-exemption questions does not foreclose class adjudication of individual religious-discrimination claims.

What *Braidwood* says regarding sincerity, not Title VII exemption, instructs our holding here. After addressing the need for individualized review of the entity exemption, the court further faulted the district court for "ignor[ing] the requirement of having common questions of law and fact" as to the businesses' religious sincerity. *Id.* at 935. Rather than engage with this requirement, the district court "merely state[d] that sincerity does not require an exacting review." *Id.* The *Braidwood* court reversed, explaining that "the fact that a review of religious sincerity may not be demanding does not mean it is a non-existent requirement or non-essential for Rule 23 purposes." *Id.*

We do not read *Braidwood* to foreclose class action whenever religious sincerity is in question. Instead, under *Braidwood*, certification may be appropriate if the district court adequately assesses the issue of religious

sincerity and finds common questions of law and fact, rather than ignores it as "a non-existent requirement or non-essential." *See id.* The district court followed that directive here: Unlike in *Braidwood*, the court here analyzed the common evidence, considered it in light of our precedents governing review of religious sincerity, and concluded that it sufficiently unified the employees for class-action purposes.[6]

We also reject United's contention that our precedent describing religious sincerity as a "fact-specific" inquiry that requires "case-by-case" review forecloses class certification here. *See, e.g.*, *Moussazadeh*, 703 F.3d at 791 (citation omitted). The facts the district court addressed—the words and actions indicating religious sincerity—are common to all class members, meaning they are generalized and can be reviewed class-wide.

Despite the common evidence demonstrating sincerity, United contends that countervailing evidence discredits some members' claims. For example, it argues that some class members stated non-religious reasons for their aversion to the vaccine, some relied on internet sources for their religious attestations and third-party statements, and some had originally planned on getting the vaccine or had received other vaccines in the past. Although none of this evidence definitively establishes that any member of the class is insincere in his or her beliefs, we agree that it might be relevant. *See id.* ("A showing of sincerity does not necessarily require strict doctrinal adherence to standards created by organized religious hierarchies," nor does sincerity "require perfect adherence to beliefs expressed by the [plaintiff]."); *Wright*, 148 F.4th at 783 ("The fact that [the plaintiff] gave additional

---

[6] And that's all the court did: Contrary to United's claim, the district court did not find religious sincerity as a matter of law. Instead, it merely determined that common evidence supported the class members' claims of religious sincerity and concluded that such evidence could be presented to the jury class-wide.

No. 24-10708

reasons for his vaccine refusal does not show that his belief is 'merely a preferred practice.' Instead, it simply shows that his vaccine refusal is grounded on both religious and non-religious reasons." (quoting *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2351 (2025))).

But its relevance at the class certification stage is limited and does not demonstrate an abuse of discretion as to commonality. United will have ongoing opportunities to present evidence demonstrating a specific employee's lack of religious sincerity and object to his or her inclusion in the class. For example, during class rostering, after discovery, or whenever the district court finds it most appropriate,[7] the court may entertain evidence showing that a particular employee does not sincerely hold the beliefs to which he or she attested. Once the final roster is established and the class contains only members whose religious sincerity United does not contest or whom United failed to show lacked sincerity, the case can be tried.

This methodology works in conjunction with the district court's preliminary conclusion that common evidence regarding religious sincerity unites the subclass, while recognizing that United may defend its case and present refuting evidence. Although some individualized questions will be presented, allowing good-faith challenges to individual employees' inclusion in the class affords United due process without dismembering an otherwise cohesive class.[8] *See infra* Section IV.B.3.b; *see also Halliburton Co. v. Erica P.*

---

[7] For instance, the district court will establish a protocol for notice to be provided and pertinent class-membership responses to be compiled and reviewed. United will have the ability to raise good-faith objections to individual claims to class-membership status.

[8] The district court did not abuse its discretion in concluding that the religious-accommodation subclass satisfied the commonality requirement but the ADA subclass did not. No common evidence supports the ADA claimants' assertions that they each have qualifying disabilities, whereas each Title VII claimant presented the same evidence to support their exemption requests.

No. 24-10708

*John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."). Were we to hold otherwise, notwithstanding the district court's well-reasoned analysis and its sound finding that the common evidence evinces sincerity, we would effectively be establishing a bright-line rule against class actions in religious-discrimination cases. Neither the Supreme Court nor this court has ever held that such claims are excluded from Rule 23, and we decline to be the first to hinder the vindication of religious freedom in this way.

ii.

Next, United challenges the district court's conclusion that the reasonableness of the unpaid-leave accommodation, which included the option to apply for a different job, can be assessed class-wide. It contends that the availability of other positions may render the accommodation reasonable for some, but not others, and that each employee's financial circumstances are relevant to the reasonableness of the accommodation. Both arguments fail.

First, the jobs for which employees could have applied does not raise individualized questions as to the reasonableness of the accommodation. After all, United did not accommodate its employees by giving them different jobs—it accommodated them by placing them on unpaid leave and giving them the *opportunity to apply* for other jobs. And this accommodation was the same for every member of this class.

Second, we agree with the district court that the financial circumstances of the class members are irrelevant to the question of reasonableness. Every member was placed on unpaid leave, meaning they lost their income and were prohibited from working. While some members may

No. 24-10708

have felt the loss of income more than others, United accommodated all members the same way. The district court correctly concluded that the reasonableness of the accommodation can be assessed by the jury and resolved in "one stroke." *See Wal-Mart*, 564 U.S. at 350.

iii.

Lastly, United argues that the undue-hardship defense must also be resolved on an individualized basis. Under Title VII, "employers . . . have a defense against a failure-to-accommodate claim if accommodating the employee's religious practice or observance would impose an undue hardship." *See Carter v. Local 556, Transp. Workers Union of Am.*, 156 F.4th 459, 479 (5th Cir. 2025). This defense requires the employer to "show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. Because Title VII imposes on the employer a "positive duty to accommodate," *Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 721 (5th Cir. 2023), it is not enough for the employer to "merely . . . assess the reasonableness of a particular possible accommodation or accommodations," *Groff*, 600 U.S. at 473. Rather, it must consider all alternatives. *See id.*; *see also Hebrew*, 80 F.4th at 722 ("If a requested accommodation poses an undue hardship, the employer must *sua sponte* consider other possible accommodations. Only after thorough consideration of other options may the employer deny the employee's request for accommodation." (citation omitted)).

United argues that one alternative accommodation to unpaid leave—masking-and-testing—requires a fact-intensive, individualized review to determine whether it would have been feasible. According to United, the degree to which masking-and-testing would have imposed a burden depends on airport size, the availability of a reserve crew, and flight schedules. The

No. 24-10708

district court rejected these contentions, concluding that United's institution of a masking-and-testing accommodation for other employees demonstrates that it was a workable alternative, and that masking-and-testing would have alleviated staffing shortages, rather than exacerbate them. It therefore found that these particularized questions do not demonstrate undue hardship and did not defeat commonality.

We agree with the district court that whether masking-and-testing would have imposed an undue burden can be answered class-wide. Of course, United may argue to a jury that the purported difficulties it identified would have resulted in "substantial increased costs." *Groff*, 600 U.S. at 470. But this does not require United to submit employee-specific evidence, given that the relevant inquiry is whether an alternative masking-and-testing accommodation would have imposed a burden that is "substantial in the *overall context* of [United's] business." *Id.* at 468 (emphasis added).

In any event, even if masking-and-testing would have imposed an undue hardship on United, at least as to some employees, United bears the burden of demonstrating, "that any and all accommodations would have imposed an undue hardship." *Hebrew*, 80 F.4th at 722 (quoting *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013)). United has failed to demonstrate that *that* question—whether every other possible alternative accommodation would have imposed a substantial increase in costs—requires individualized review, even if *some* of the possibilities raise more individualized questions.[9] Therefore, we hold that the district court did

---

[9] For example, even if United were correct that masking-and-testing would have imposed different burdens depending on the pilot, it's hard to believe that a quarantine requirement or the creation of an unvaccinated-only flight crew for customers not apprehensive of the virus would require individualized assessment.

not abuse its discretion in finding that commonality was satisfied for the undue-burden inquiry.

b.

United also appeals the district court's conclusion that common questions predominate for the unpaid-leave subclass, arguing that individualized liability and damages questions require each member to present evidence. We again conclude that the district court did not abuse its discretion.

As discussed above, all the questions of liability—except perhaps some questions regarding the sincerity of certain members' beliefs—are common questions that can be resolved using the same evidence. But even as to religious sincerity, "[t]hat [United] might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton*, 573 U.S. at 276; *see also Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 645–46 (5th Cir. 2016) (en banc) ("Evidence indicating that a few class members decided to take the risk of being a winner in an illegal pyramid scheme does not automatically rebut the inference of reliance for the overwhelming remainder of class members or mean that individual issues concerning the atypical knowing fraudsters will predominate at trial."); *see also Moussazadeh*, 703 F.3d at 791 ("Sincerity is generally presumed or easily established.").

Nor did the district court err in concluding that common questions predominate for damages. Our precedent holds that "[e]ven where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a classwide basis.'" *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020) (quoting *Comcast Corp.*, 569 U.S. at 34). While there is some tension with that

requirement and other binding precedent, we hold that the district court reasonably concluded that damages are largely measurable class-wide. *Compare id.*, *with Tyson Foods*, 577 U.S. at 453 (explaining that certification may be appropriate when "one or more of the central" issues are common and predominate, "even though other important matters will have to be tried separately, such as damages" (citation omitted)), *and Sampson*, 83 F.4th at 422 ("[I]t is well established that common questions may predominate under Rule 23(b)(3) 'even though other important matters will have to be tried separately, *such as damages.*'" (quoting *Tyson Foods*, 577 U.S. at 453)), *and Chavez*, 108 F.4th at 318–19 ("[R]ecognizing the necessity for individual damages calculations does not preclude class certification under Rule 23(b)(3).").

The class here seeks backpay, compensatory damages, and punitive damages. The district court determined that backpay could be calculated with a mathematical formula[10] using the average earnings for each member, and that the jury could determine an appropriate multiplier for any punitive damages. We agree that a jury could use this or a similar methodology to calculate backpay and punitive damages, and thus these damages are amenable to class-wide resolution, even though they will result in individualized awards.[11] *See Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 739 (5th Cir. 2023) ("Some degree of individual calculation, however, is not fatal to satisfying predominance."). And although United argues that the formula is inaccurate and fails to take into account other pertinent information, these defenses are themselves "common to the claims made by

---

[10] Indeed, the data on each employee's compensation and regular work hours and schedule is in United's possession and presumably not difficult to retrieve.

[11] Unlike the Rule 23(b)(2) class members who suffered various injuries, each member here incurred the same harm—unpaid leave.

all class members" and do not undermine predominance. *See Tyson Foods*, 577 U.S. at 457.

United also argues that the formula is faulty because it cannot calculate compensatory damages, such as the damages stemming from emotional harm. However, the formula does not purport to calculate those damages, nor could it. "The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards." *Allison*, 151 F.3d at 417 (footnote omitted).[12] Therefore, these damages will likely have to be separately tried. But given that all other "central issues in the action are common to the class," the class's request for compensatory damages does not defeat predominance. *See Tyson Foods*, 577 U.S. at 453–54 (citation omitted); *see also Chavez*, 108 F.4th at 318 ("Notably, the predominance inquiry can still be satisfied under Rule 23(b)(3) if the proceedings are structured to establish liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members." (citation modified)); *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 298 (5th Cir. 2001) ("Determining damages may require the district court to reconsider class treatment of

---

[12] The court in *Allison* also said that, in addition to compensatory damages, "punitive damages require[] particularly individualized proof of injury, including how each class member was personally affected by the discriminatory conduct." 151 F.3d at 416. However, it also left open the possibility that "punitive damages may be awarded on a class-wide basis, without individualized proof of injury, where the entire class or subclass is subjected to the same discriminatory act or series of acts." *Id.* at 417. The class members' allegations here fall squarely within this category. For the purposes of this appeal, we do not disturb *Allison*'s assumption that class-wide punitive damages are available in the circumstances it described.

No. 24-10708

damages, but given the great significance of common issues in this case, we find no abuse of discretion in the district court's determination that common issues predominated.").

Accordingly, we conclude that the district court did not abuse its discretion in finding that the common questions predominate for the unpaid-leave subclass.

c.

Finally, United challenges the district court's determination that a class action is the superior method for adjudicating this claim. To determine whether a class action is superior, "the district court must compare and 'assess the relative advantages of alternative procedures for handling the total controversy.'" *Ibe v. Jones*, 836 F.3d 516, 529 (5th Cir. 2016) (quoting *In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013)). This is a "fact-specific" inquiry that "varies depending on the circumstances of each case." *Id.* When assessing superiority, courts consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

We conclude that the district court did not abuse its discretion in holding that superiority is satisfied here. As the district court explained, judicial economy is well served by resolving in one action the claims of hundreds of individuals who raise the same questions of law and fact and for whom identical evidence supports (and opposes) their claims. By letting one jury consider these common questions—rather than asking multitudes of juries the same questions—the district court will conserve considerable resources. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 749 n.27 (5th Cir.

No. 24-10708

1996) ("The procedural device of Rule 23(b)(3) class action was designed not solely as a means for assuring legal assistance in the vindication of small claims but, rather, to achieve the economies of time, effort, and expense." (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1196 (6th Cir. 1988))). Simply put, the overwhelming predominance of common questions as to the "relevant claims, defenses, facts, and substantive law" supports adjudicating this case as a class action. *See Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525 (5th Cir. 2007) (quoting *Allison*, 151 F.3d at 419).

Other considerations, such as some class members' possible "unwilling[ness] to sue individually or join a suit for fear of retaliation at their jobs" and the district court's acute familiarity with the parties and the issues, further demonstrate that a class action is superior. *See Mullen*, 186 F.3d at 625 (affirming district court's holding that joinder of all potential class members would be impracticable, at least in part because some members would be reluctant to individually sue).

United argues that superiority is lacking because Title VII's generous damages cap and the availability of attorney's fees incentivizes those harmed by its policies to pursue their claims individually. *See Allison*, 151 F.3d at 420 ("The relatively substantial value of these claims (for the statutory maximum of $300,000 per plaintiff) and the availability of attorneys' fees eliminate financial barriers that might make individual lawsuits unlikely or infeasible. Thus, the principles underlying the (b)(3) class action counsel against (b)(3) certification in this case." (citation omitted)); *see also Castano*, 84 F.3d at 748 (noting that the "most compelling rationale for finding superiority in a class action" is "the existence of a negative value suit"). It further argues that the existence of similar suits against United and manageability problems with a 1,000-member class make a class action inferior.

No. 24-10708

While these are indeed relevant considerations, they do not convince us that the district court abused its discretion in finding that a class action is superior. Regardless of Title VII's financial incentives or the fact that others have brought individual claims, the court reasonably determined that it would be efficient to resolve the common questions this class presents in one action. *See Sampson*, 83 F.4th at 418–19 ("An abuse of discretion occurs only when all reasonable persons would reject the view of the district court." (citation omitted)). Further, the identity among the class reduces the likelihood of manageability problems. Therefore, we conclude that the district court acted within its discretion when it concluded that a class action is superior.

V.

The district court thoroughly assessed whether each of Plaintiffs' proposed classes comported with Rule 23. It concluded that only a Rule 23(b)(3) subclass of employees whose religious convictions prevented them from getting the COVID-19 vaccine and whom United accommodated with unpaid leave could proceed as a class, rejecting Plaintiffs' proposed Rule 23(b)(2) class and Rule 23(b)(3) ADA and masking-and-testing subclasses. We find no abuse of discretion in any of these conclusions. Accordingly, we AFFIRM.

No. 24-10708

Don R. Willett, *Circuit Judge*, concurring in part and concurring in the judgment:

Class actions are an extraordinary procedural device. They make possible the vindication of meritorious claims that would otherwise be too small to pursue,[1] protect defendants from inconsistent judgments about identical conduct,[2] and—when used wisely—promote judicial efficiency by avoiding repetitive litigation of the same issues.[3]

But the very features that make class actions powerful can also make them perilous. Although "[c]lass actions serve an important function in our system of civil justice," they also "present . . . opportunities for abuse as well as problems for courts and counsel in the management of cases."[4] They can produce "potential unfairness" for absent class members whose claims may

---

[1] *See, e.g., Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (describing "overcom[ing] the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights" as "[t]he policy at the very core of the class action mechanism" (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)).

[2] *See* Fed. R. Civ. P. 23(b)(1)(A).

[3] *See Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974) (describing "efficiency and economy of litigation" as "a principal purpose of the [class action] procedure"); *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) ("The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [unlawful] activity.").

[4] *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99–100 (1981).

be extinguished without their direct participation.[5] And they can "create[] insurmountable pressure on defendants to settle" to avoid "[t]he risk of . . . an all-or-nothing verdict . . . , even when the probability of an adverse judgment is low."[6]

These competing realities explain why Federal Rule of Civil Procedure 23 imposes demanding requirements for class certification— requirements designed to ensure that class actions remain a narrow "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."[7] And because Rule 23 entrusts the application of those requirements largely to district courts, appellate review of certification decisions is correspondingly restrained.

However narrow the role Rule 23 assigns to the class-action mechanism, the role it assigns appellate courts is narrower still. "[M]ost issues arising under Rule 23" are "committed in the first instance to the discretion of the district court,"[8] which is "vested" with "broad power and discretion" over those matters.[9] Although "order[s] granting or denying

---

[5] *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *see also Sosna v. Iowa*, 419 U.S. 393, 399 n.8 (1975) (noting the "important consequences" of class certification "for the unnamed members of the class").

[6] *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746 (5th Cir. 1996) (citations omitted).

[7] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).

[8] *Yamasaki*, 442 U.S. at 703.

[9] *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979); *see also Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 933–34 (5th Cir. 2023) ("District courts have significant leeway over the management of class actions."); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("[W]e note that the district court maintains great discretion in certifying and managing a class action."); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998) ("We note at the outset that the district court maintains substantial discretion in determining whether to certify a class action. . . .").

No. 24-10708

class-certification" may be appealed,[10] our review remains "deferential."[11] "We will reverse a district court's decision to certify a class only upon a showing that the court abused its discretion or that it applied incorrect legal standards in reaching its decision."[12] Rule 23 entrusts its many judgment calls to district judges on the front lines—not appellate panels on the sidelines. When a case can be resolved by respecting that allocation of authority, appellate courts should refrain from deciding more than necessary.

For those reasons, I join Parts IV-A and IV-B-1 of the majority opinion, which ably explain why the district court acted within its discretion in declining to certify the plaintiffs' proposed Rule 23(b)(2) class and their proposed Rule 23(b)(3) masking-and-testing class. I also join Part IV-B-2, which correctly concludes that the district court likewise acted within its discretion in separating the ADA claims from the unpaid-leave class it did certify.

I also agree with the majority that the district court acted within its discretion in certifying a class "consisting of all employees of United deemed customer-facing who received an accommodation due to a sincerely held religious belief[] and who were put on unpaid leave." The majority, however, rests that conclusion in part on its holding that religious sincerity presents a

---

[10] FED. R. CIV. P. 23(f). Ordinarily "the Federal Rules 'do not create or withdraw federal jurisdiction'" because "Congress alone" has that authority. *In re Serta Simmons Bedding, LLC*, 125 F.4th 555, 575 (5th Cir. 2024) (quoting *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004)). But the Federal Courts Administration Act of 1992 authorizes the Supreme Court to "prescribe rules . . . to provide for an appeal of an interlocutory decision to the courts of appeals that is not otherwise provided for." 106 Stat. 4506, § 101 (codified at 28 U.S.C. § 1292(e)). The Court exercised that authority in 1997 by promulgating Rule 23(f). *See Amendments to the Federal Rules of Civil Procedure*, 523 U.S. 1225 (1997).

[11] *Vizena v. Union Pac. R.R.*, 360 F.3d 496, 504 (5th Cir. 2004) (per curiam).

[12] *Mullen*, 186 F.3d at 624 (citations omitted).

No. 24-10708

common issue capable of classwide resolution. That is a difficult question—and I am not convinced the answer is yes. But we need not decide it today. Because this case can be resolved on narrower grounds, I would leave that question for another day. Still, the majority's treatment of religious sincerity as a common issue merits brief discussion.

## I.   Religious Sincerity as a Common Issue

Title VII prohibits discrimination based on certain protected characteristics, including (as relevant here) religion.[13] One "essential part" of a Title VII religious-discrimination claim is "[t]he sincerity of a plaintiff's belief in a particular religious practice."[14] The majority holds that the class members' religious sincerity is an issue common to all class members. That holding gives me pause.

To be "common," a question "must be of such a nature that it is capable of classwide resolution."[15] That is, it must "resolve an issue that is central to the validity of" each class member's claims "in one stroke."[16] Yet evaluating religious sincerity requires a court to inquire into each individual's "own scheme of things."[17] Thus, one person's religious beliefs reveal little about another's. Religious conviction, after all, is no herd phenomenon but a matter of individual conscience. Religious beliefs need not be shared by others, nor must they be "acceptable, logical, consistent, or comprehensible

---

[13] *See* 42 U.S.C. §§ 2000e-2(a)(1); *Wright v. Honeywell Int'l, Inc.*, 148 F.4th 779, 782 (5th Cir. 2025) ("Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees on the basis of religion.").

[14] *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013), *abrogated on other grounds by Groff v. DeJoy*, 600 U.S. 447 (2023).

[15] *Wal-Mart*, 564 U.S. at 350.

[16] *Id.*

[17] *United States v. Seeger*, 380 U.S. 163, 185 (1965).

No. 24-10708

to others."[18] Courts may not evaluate "the 'truth' of a belief," but we *must* determine whether it is "truly held."[19]

As a result, "[t]he sincerity of a person's religious belief is a question of fact unique to each case."[20] Evidence about one person's beliefs therefore sheds little light on anyone else's—including a co-worker's in a religiously diverse workplace. And because sincerity "is largely a matter of individual credibility,"[21] it ordinarily "demands . . . the opportunity for the factfinder to observe the claimant's demeanor during direct and cross-examination."[22] Conducting only "[a] more cursory evaluation raises the spectre that the sincerity issue will be decided by reference to the factfinder's perception of what a religion should resemble."[23] I therefore have serious reservations about the majority's conclusion that layering individualized inquiries atop one another can produce a question capable of resolution "in one stroke."[24]

The majority purports to resolve this problem by suggesting that the plaintiffs will prove their sincerity in the same way—by pointing to their exemption requests, third-party attestations, and willingness to forgo their paychecks to live out their claimed religious beliefs. But that only raises more questions. While an issue may be common when "the same evidence will

---

[18] *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

[19] *Gillette v. United States*, 401 U.S. 437, 457 (1971) (quoting *Seeger*, 380 U.S. at 185).

[20] *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014).

[21] *Tagore*, 735 F.3d at 328.

[22] *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984).

[23] *Id.*

[24] *Wal-Mart*, 564 U.S. at 350.

No. 24-10708

suffice for each member to make a prima facie showing,"[25] what these class members have is not *the same* evidence; it is merely evidence *of the same type*. There is not one piece of evidence that is even *relevant* across the board, let alone "suffic[ient] for each member to make a prima facie showing" of sincerity.[26] No class member's exemption request, third-party attestation, or financial sacrifice is relevant to any other class member's sincerity. And a factfinder will have to evaluate each request, attestation, and sacrifice independently. If that sort of independent-but-parallel proof were enough, no putative class would ever fail the commonality requirement.[27]

*        *        *

Whether sincerity is—or can ever be—a common issue is a thorny question. But we need not answer it today. "[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more"—counsels exactly that course here.[28] Because the district court's certification decision can be sustained without resolving the sincerity question, our task reduces to a familiar one: asking only whether the court abused its discretion.

## II.    Abuse of Discretion

The majority suggests that, if sincerity is not a common issue, there is "effectively . . . a bright-line rule against class actions in religious-

---

[25] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

[26] *Id.*

[27] *But see Wal-Mart*, 564 U.S. at 348–60 (reversing certification for lack of commonality).

[28] *PDK Lab'ys v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment).

No. 24-10708

discrimination cases."[29] But Rule 23 "does not require that all issues be common to all parties."[30] Rather, so long as the other requirements are satisfied, "even a single common question will do."[31] And, as the majority explains, there are two other common questions in this case. As far as commonality is concerned, either one would do the trick.

That leaves the remaining Rule 23 requirements: numerosity, typicality, adequacy, predominance, and superiority. Numerosity, typicality, and adequacy—the remaining Rule 23(a) prerequisites—are satisfied for the reasons the majority explains. The only remaining questions are whether the common issues predominate and whether the class action mechanism is superior to "other available methods"[32]—two questions that often overlap.[33]

In evaluating predominance and superiority, the district court's discretion is at its apex. Both inquiries require predictions about how the remaining proceedings will unfold.[34] And the district judge—who has

---

[29] Maj. Op. at 23.

[30] *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992).

[31] *Wal-Mart*, 564 U.S. at 359 (cleaned up); *accord In re Deepwater Horizon*, 739 F.3d 790, 811 (5th Cir. 2014); *see* 1 Newberg & Rubenstein on Class Actions § 3:20 (6th ed.) ("Since one common issue is sufficient, notwithstanding the plural language of Rule 23(a)(2), courts uniformly recognize that not *all* questions of law and fact need be common to the class.").

[32] Fed. R. Civ. P. 23(b)(3).

[33] *See Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006) (noting "the interrelationship between predominance and superiority").

[34] *See* Fed. R. Civ. P. 23(b)(3)(D) (directing courts assessing predominance and superiority to consider "the likely difficulty in managing a class action"); *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376 (5th Cir. 2016) ("At bottom, the [predominance] inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of a trial."); *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 555 (5th Cir. 2011) ("Determining whether the

No. 24-10708

handled this case since its inception—is far better positioned to make those predictions than we are. We may second-guess his assessment only if it is unreasonable. And I cannot say that it is; though United has raised serious questions about some class members' sincerity, the "light touch" with which courts must handle claims of sincerity suggests that issue will not dwarf the other, common issues.[35] And while United points to other individualized issues—such as compensatory and punitive damages—the district court could have reasonably concluded that the common issues (the reasonableness of the unpaid leave accommodation and whether a more fulsome accommodation would have imposed an undue hardship on United) predominate over those issues as well.

The Supreme Court's recent decision in *Mirabelli v. Bonta* illustrates that resolving complex questions about whether sincerity can ever be a common question is unnecessary here.[36] The plaintiffs in *Mirabelli* raised claims under the Free Exercise Clause, which—like Title VII—requires sincerity.[37] The district court certified a class without addressing sincerity[38]

_____

superiority requirement is met requires a fact-specific analysis and will vary depending on the circumstances of any given case." (citation omitted)).

[35] *See Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 792 (5th Cir. 2012) ("Though the sincerity inquiry is important, it must be handled with a light touch, or judicial shyness." (cleaned up)).

[36] *See* No. 25A810, 2026 WL 575049 (U.S. Mar. 2, 2026) (per curiam).

[37] *Id.* at *1; *see DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019) ("To fall within the purview of the Free Exercise Clause, a claimant must possess a sincere religious belief."); *Union Gospel Mission of Yakima v. Brown*, 162 F.4th 1190, 1205 (9th Cir. 2026) ("[T]he First Amendment protects only sincerely held religious belief and acts rooted in religious belief." (cleaned up)).

[38] *See Mirabelli v. Olson*, 350 F.R.D. 138 (S.D. Cal. 2025).

No. 24-10708

and issued a classwide injunction.[39] The Ninth Circuit stayed that injunction, concluding (among other things) that "the District Court had granted class certification without undertaking the 'rigorous analysis' required by" Rule 23.[40] But the Supreme Court vacated the stay, explaining that "class certification was likely proper" because "[t]he District Court addressed the requirements for certification under Rule 23 and explained why it concluded they were met."[41] Although *Mirabelli* is an "interim[] order" and therefore "not conclusive as to the merits," it nevertheless "informs" the proper role of appellate review.[42]

*Mirabelli* thus underscores an important point: appellate courts need not settle every doctrinal question to resolve the case before them. And it demonstrates that appellate courts may sustain a district court's certification decision without announcing a sweeping rule about whether religious sincerity can be resolved without individualized assessment.

*       *       *

Even if sincerity is not a common issue, the district court's conclusion that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the

---

[39] *See Mirabelli v. Olson*, No. 3:23-cv-0768-BEN-VET, 2025 WL 3712993 (S.D. Cal. 2025).

[40] *Mirabelli*, 2026 WL 575049, at *2.

[41] *Id.* at *3.

[42] *See Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (per curiam); *see NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2663–64 (2025) (Gorsuch, J., concurring in part and dissenting in part).

controversy"[43] was neither unreasonable nor an abuse of discretion. As a result, it is not necessary for us to decide whether sincerity is a common issue.

## III.   Proceedings on Remand

Rule 23's grant of discretion to the district courts does not end with certification. Rather, district courts have "broad power and discretion . . . with respect to matters involving the certification *and management* of potentially cumbersome . . . class actions."[44] As a result, the district court's discretion over *this* class action does not end when we issue our mandate affirming the class certification.

As the majority recognizes, the district "court may entertain evidence showing that a particular employee does not sincerely hold the beliefs to which he or she attested" "[d]uring class rostering, after discovery, or whenever the district court finds it most appropriate."[45] In adopting mechanisms to separate the sincere wheat from the disingenuous chaff, the district court should keep in mind that because the class seeks damages for intentional discrimination, Title VII (not to mention the Seventh Amendment) gives United the right to have a jury determine its objections to individual class members' sincerity.[46] That procedure is not optional; it is "as central to the American conception of the consent of the governed as an

---

[43] Fed. R. Civ. P. 23(b)(3).

[44] *Reiter*, 442 U.S. at 345 (emphasis added); *accord Mullen*, 186 F.3d at 624 ("[W]e note that the district court maintains great discretion in certifying *and managing* a class action." (emphasis added)).

[45] Maj. Op. at 22.

[46] 42 U.S.C. § 1981a(c)(1); *see* U.S. Const. amend. VII; *Allison*, 151 F.3d at 423 ("Once the right to a jury trial attaches to a claim, . . . it extends to all factual issues necessary to resolving that claim." (citation omitted)).

elected legislature or the independent judiciary."[47] And the class action device cannot be used to circumvent it.[48]

Once rubber meets the road, the district court may find that whatever individualized mechanism is necessary to resolve United's challenges to individual class members' sincerity is unreasonably cumbersome or seriously undermines the advantages of classwide proceedings. If so, the district court retains discretion to decertify the class and require individual suits—as it has already done for the two other putative classes.[49] But the possibility that decertification may be warranted eventually is not a reason for reversing certification immediately.

## IV. Conclusion

When a district court certifies a class, we review that decision only for abuse of discretion.[50] And a decision survives that deferential standard "unless it is arbitrary or clearly unreasonable."[51] The district court's decision certifying the unpaid-leave class was neither—regardless of whether

---

[47] Jennifer Walker Elrod, *Is the Jury Still Out? A Case for the Continued Viability of the American Jury*, 44 Tex. Tech L. Rev. 303, 303–04 (2012).

[48] *Cimino v. Raymark Indus.*, 151 F.3d 297, 312 (5th Cir. 1998) ("[T]his Court has long held that the applicability of the Seventh Amendment is not altered simply because the case is a Rule 23(b)(3) class action." (citing *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978)); *see also Ross v. Bernhard*, 396 U.S. 531, 541 (1970) (noting that, despite class actions' equitable ancestry, "it now seems settled . . . that class action plaintiffs may obtain a jury trial on any legal issues they present").

[49] *See* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."); *In re Rodriguez*, 695 F.3d 360, 367 n.8 (5th Cir. 2012) ("[O]ur caselaw is clear that courts are free as often as necessary before judgment to reconsider whether class certification continues to be appropriate." (cleaned up)).

[50] *See Mullen*, 186 F.3d at 624.

[51] *Banco Mercantil de Norte, S.A. v. Paramo*, 114 F.4th 757, 760 (5th Cir. 2024) (cleaned up).

No. 24-10708

religious sincerity is a common issue. Accordingly, we must affirm. And because "[w]e need not decide more, . . . I would not decide more."[52]

---

[52] *Trump v. Illinois*, 146 S. Ct. 432, 435 (2025) (Kᴀᴠᴀɴᴀᴜɢʜ, J., concurring).